UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                 09 CR 157 (RPP)

                      - against -
                                                 **OPINION AND ORDER**

HECTOR DOMINGUEZ-GABRIEL,

                                        Defendant.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On December 31, 2009, the Defendant, Hector Dominguez-Gabriel, moved this Court to suppress statements he made in a post-arrest interview, to suppress physical evidence seized at the time of arrest, and for a bill of particulars.  An evidentiary hearing was held on January 15, 2010, and it was continued on February 17, 2010.  The parties submitted additional post-hearing memoranda of law in support of and in opposition to the Defendant's motion on March 25, 2010 and April 1, 2010.


**I. Facts and Proceedings**

On February 19, 2009, a grand jury issued a sealed indictment which charged the Defendant in this case with conspiring to violate 18 U.S.C. § 1956(a)(1)(B) (money laundering) and conspiring to violate 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A), per 21 U.S.C. § 846 (conspiracy to distribute and import narcotics).  On April 15, 2009, Magistrate Judge Fox issued an arrest warrant for the Defendant.  On June 18, 2009, the Defendant was arrested by Customs and Border Protection officers at Miami International Airport, upon his arrival into this country from Mexico.  Transcript of

evidentiary hearing held on Jan. 15, 2010 and Feb. 17, 2010 (hereinafter "Tr.") at 57-58.

Following his arrest, the Defendant was interrogated for an hour or more by several

agents from a multi-agency strike force.  Tr. at 7, 35.  Present at various times during the

interview were five law enforcement agents: Special Agent Greg Tanella (Drug

Enforcement Agency (DEA)), Detective Pete Crespo (New York Police Department

(NYPD)), Special Agent Tracy Di Maria (Internal Revenue Service (IRS)), Intelligence

Research Specialist Eileen Moynahan (DEA), and Special Agent Robert Perez (DEA),

each of whom testified at the hearing.

On December 31, 2009, the Defendant submitted a declaration in which he

describes the June 18, 2009 interview.  In his declaration, the Defendant states that he

was interrogated in a small basement room with "as many as approximately 8 agents in

the room with" him and that he was not advised of his *Miranda* rights prior to the

interview.  Dominguez-Gabriel Declaration ¶¶4, 14.  The Defendant also states in his

declaration that the interview was in English, although his primary language is Spanish,

and that as a result, he "did not understand a great deal of what the agents said."  *Id*. ¶5.

In the declaration, the Defendant also states that the agents questioning him threatened

him with a lengthy prison sentence, extradition (knowing that he believed he would be

killed if he were extradited to Mexico), and the seizure of all his property if he did not

answer their questions and that they screamed at him during the questioning.  *Id*. ¶¶6-7, 9,

11-12.  The Defendant states that, during the interview, he was in handcuffs so tight as to

be painful, that the agents physically pushed him, and that the agents denied his requests

for his blood pressure and diabetes medications and his request to contact an attorney.  *Id*.

¶¶8-10, 16.  As a result of the threats, the Defendant states that he decided to answer the

agents' questions. *Id*. ¶13. The Court notes that the Defendant's declaration contains many vague and conclusory statements, and provides few details. As such, it stands in stark contrast to the testimony of the DEA, IRA, and NYPD law enforcement officials at the evidentiary hearing, who testified at length and in detail and who were subjected to questioning by both the government and defense counsel.

The DEA Report of Investigation, submitted as Exhibit A to the Defendant's pre-hearing motion ("DEA Report"), indicates that Detective Pete Crespo "presented DOMINGUEZ-Gabriel with a copy of the Miranda warning in Spanish . . . and had the arrestee read it aloud." DEA Report at 2. Following this procedure, the DEA Report indicates that Detective Crespo asked the Defendant if he understood the warning, that the Defendant "confirmed that he did," that Special Agent Tanella asked the Defendant if he was willing to speak, and that the Defendant indicated he was willing to speak. *Id*. The DEA Report also indicates that agents seized several cell phones and notebooks from the Defendant "at the time of his arrest." *Id*. The remainder of the DEA Report describes the content of the interview. Of note to this motion, the DEA Report describes the following incident towards the end of the interview: "[t]hroughout the debriefing, DOMINGUEZ-Gabriel would frequently smile and did not appear to be taking his arrest seriously. SA Perez asked DOMINGUEZ-Gabriel whether he would be laughing if DOMINGUEZ-Gabriel had been arrested in Mexico and taken to SIEDO (the organized crime division of the Mexico attorney general's office). DOMINGUEZ-Gabriel replied that if he were in the SIEDO, he would already be dead." *Id*. at 8.

Government Exhibit 1, admitted into evidence at the hearing, shows a DEA form bearing the *Miranda* warnings in Spanish and English. Tr. at 10. It is labeled "HECTOR

DOMINGUEZ-GABRIEL," and was signed by the Defendant, Detective Crespo, Special Agent Tanella, and Special Agent Di Maria. *See* Tr. at 11.

At the evidentiary hearing held on January 15, 2010, Special Agent Tanella testified that he was not present for the entire interview, and that he left the interview room, which was located in the Customs and Border Protection offices at Miami International Airport, several times to coordinate with other officials. Tr. at 6. Special Agent Tanella testified that, prior to questioning the Defendant about the charges against him, Detective Crespo "showed [the Defendant] the Miranda warning on paper, had him read the Spanish version and then Detective Crespo read that line by line." Tr. at 9-10. After the *Miranda* warnings were given, the Defendant signed the form, at which point he was asked if he wanted to answer questions and he said yes. Tr. at 12. Special Agent Tanella testified that, during his time in the interview, the Defendant appeared in good health, did not request any medication, did not complain about the interview conditions, did not ask to speak to a lawyer, and did not ask that the questioning stop. Tr. at 8-9, 17. He also testified that, to his knowledge, the Defendant was not handcuffed during the interview. *Id*. During his time in the interview room, Special Agent Tanella testified that most of the questions were asked in Spanish or were translated into Spanish, and that when questions were asked in English without translation, it appeared that the Defendant understood and responded appropriately to those questions. Tr. at 13-16. Special Agent Tanella testified that he did not: tell the Defendant that he had to cooperate with the federal government, state that unless he cooperated he could be sent to another country or have his possessions or property taken from him, physically push the Defendant, or raise his voice; nor did he see another agent do any of the above. Tr. at 16-18. Nor did he or

4

any other agent tell the Defendant that unless he cooperated he would be extradited to Mexico and killed.  *Id*.  Special Agent Tanella did testify that he informed the Defendant that he was under arrest for money laundering, which he described as a "serious offense," and that he "asked him to cooperate, to help himself, to better himself."  Tr. at 29, 27.

At the same evidentiary hearing, Intelligence Research Specialist Moynahan, who is proficient in Spanish, testified that she was present for the entire interview of the Defendant.  Tr. at 57-58.  Intelligence Research Specialist Moynahan testified that the Defendant was read his *Miranda* warnings and "was asked if he understood his rights and he indicated that he did."  Tr. at 62.   She further testified that "part way" through the interview the Defendant did request his diabetes medication from his luggage but that because the medication was unlabelled, the Customs and Border Protection agent needed to have a supervisor's approval, after which she provided the pill to him and he took it. Tr. at 59-60.  She also testified that Customs and Border Protection had provided the Defendant with a "standardized airplane lunch" but that he refused to eat it, explaining "that he needed to eat lean meats, fish, fresh fruits and vegetables."  Tr. at 59.

Intelligence Research Specialist Moynahan testified that she was "almost positive that the interview was conducted without him being in handcuffs," and that she recalled him reaching out to various objects on the table in the interview room, and she testified that this was something he could not have done while in handcuffs.  Tr. at 60.  She also testified that "[t]he vast majority of the questions were in English," without translation and that "there was some Spanish spoken during the main body of the interview, but the questions were asked in English and he answered them in English, obviously understanding what we were asking because his responses were appropriate."  Tr. at 63.

Intelligence Research Specialist Moynahan testified that she was present for the entire interview and did not witness any of the interviewers physically push the Defendant or threaten to extradite the Defendant to Mexico where he would be killed. Tr. at 64-65.  She acknowledged that the interviewers cautioned the Defendant that he had been arrested on very serious charges and that cooperation could be beneficial to him.  Tr. at 65.  She also testified that the agents raised their voices, at times, in speaking to the Defendant, often after the Defendant had given an unhelpful answer.  Tr. at 66. She testified that the Defendant never asked that the interview stop or requested a lawyer. Tr. at 65.  And she testified that, at the end of the interview, when the other agents had stepped into the hallway, "Special Agent Perez was talking to [the Defendant] and he said, you shouldn't be laughing, you realize what would have occurred had you been arrested by the Meixcans in Mexico, and what would have happened had you been taken to the SIEDO. . . . And Mr. Dominguez said, yes, I would probably already be dead."  Tr. at 67.  She also confirmed that Special Agent Perez "spoke firmly in a raised voice" when he asked the Defendant about SIEDO, and later that Perez was aware that "among the Mexican population [SIEDO] has sort of a scary image."  Tr. at 76, 80.  She testified that after the interview in the Customs and Border Protection offices, which she said took about two hours, the Defendant was then taken to the DEA office, also at Miami International Airport, to fill out the intake forms for the Bureau of Prisons.  Tr. at 77, 85.

Special Agent Di Maria of the IRS testified that she was present as the Defendant was informed of his *Miranda* rights and that the Defendant was not questioned prior to signing that he understood his *Miranda* rights.  Tr. at 102.  Special Agent Di Maria testified that during the interview, questions were asked in Spanish and in English.  Tr. at

95.  She also testified that she and her fellow agents informed the Defendant of the gravity and possible consequences of the offenses for which he had been arrested.  Tr. at 97.  Special Agent Di Maria testified that the Defendant requested medication but that she did not see him receive the medication.  Tr. at 98.  She also testified that the Defendant was not handcuffed until the interview had ended.  *Id*.  And she testified that she did not recall the Defendant requesting an attorney.  Tr. at 99.  She testified that she asked the Defendant what property he owned in Mexico.  Tr. at 100.  She also testified that she raised her voice an octave when asking the Defendant the full names of individuals, instead of the "street names, nicknames, aliases" that he was using.  Tr. at 98.  She said she did not raise her voice to intimidate, but to seek clarification.  Tr. at 104.

At the same evidentiary hearing, Detective Crespo testified that the Defendant had been advised of his *Miranda* rights, that he personally had asked the Defendant, in Spanish, whether he understood the warnings, and that the Defendant had read the warnings aloud in Spanish.  Tr. at 109, 111.  He testified that prior to the warnings being given, Special Agent Perez had been alone with the Defendant and had been talking with him for "one or two minutes."  Tr. at 109-10, 112.  He testified that "most" of the questions were asked in Spanish, some were asked in English, and the Defendant responded in English to some of the questions without any problems.  Tr. at 113-14.  Detective Crespo testified that the Defendant was told by Agent Perez, during the course of the interview, that "he was looking at a lengthy sentence in jail."  Tr. at 116.  He testified that the Defendant was not handcuffed until the end of the interview when he was transported to a holding facility.  Tr. at 115.  Detective Crespo also testified that he did not hear the Defendant ask to speak with an attorney.  Tr. at 113.

The evidentiary hearing resumed on February 17, 2010, with Special Agent Perez's testimony. Special Agent Perez testified that he had been assigned to deal with the Mexican Attorney General's office and other Mexican governmental agencies and that he had traveled with the Defendant from Mexico City to Miami on the same flight, so that he could observe the Defendant and ensure that he was on the scheduled flight. Tr. at 122-23. He also testified that the DEA had decided not to share its information with the Mexican government, because the Strike Force thought the Defendant would be more likely to cooperate if he was arrested in the United States. Tr. at 123. Special Agent Perez testified that the Defendant was arrested by a Customs and Border Protection officer as he left the airplane and taken to Customs and Border Proteciton offices. Tr. at 144. Special Agent Perez testified that he was present in the "very beginning" of the interview, when Special Agent Perez, Special Agent Tanella, Detective Crespo, Special Agent Di Maria, and Intelligence Research Specialist Moynahan introduced themselves and informed the Defendant that he was under arrest and the nature of the charges before *Miranda* warnings were given in Spanish to the Defendant. Tr. at 125-26, 145. To reduce the number of agents present, Special Agent Perez left after the introductions and before the *Miranda* warnings were read; he returned about halfway through the interview because Agent Tanella informed him that the Defendant was not giving helpful information. Tr. at 125, 127, 136, 148.

Special Agent Perez testified that during the interview he raised his voice, but did not scream at the Defendant, because he "was extremely agitated with [the Defendant's] lack of cooperation due largely to the fact that he was in custody in the United States because of actions that I undertook versus being in custody in Mexico." Tr. at 127, 139,

8

147.  At the hearing, he explained that in the United States, a defendant may derive benefits at sentencing by cooperation; the criminal justice system in Mexico does not allow for cooperation agreements or "5K letters."  Tr. at 128.  Special Agent Perez testified that he told the Defendant about the benefits of cooperation with authorities in the United States but did not contrast these benefits with the situation in Mexico.  Tr. at 128.  He also testified that he told the Defendant that he had arranged to have the Defendant arrested in the United States because he could get benefits by cooperation in the United States.  Tr. at 128-30.  When Perez mentioned that it was better to have been arrested in the United States, the Defendant laughed, at which point, Special Agent Perez asked the Defendant, in a loud voice, if he would be laughing if he had been arrested by the SIEDO in Mexico.  Tr. at 130, 132.  The Defendant then responded that he would be dead if he had been taken into custody by SIEDO and leaned forward across the table and stated, "that if I really had balls, that I would go with him down to Colombia and he would show me the offices . . . [and] the locations where drug organizations ran their operations from."  Tr. at 130, 133.  Special Agent Perez also testified that he was aware that SIEDO had a reputation involving "abuse of prisoners and things of that nature."  Tr. at 131.  Special Agent Perez further maintained that he told the Defendant that any "cooperation would be brought to the attention of the Court and he would get a benefit" and that "[i]f he didn't cooperate, that would also be brought to the attention of the Court."  Tr. at 134.  Special Agent Perez denied telling the Defendant that if he did not cooperate he would be sent to prison for the remainder of his life.  *Id*.  Special Agent Perez testified that he did inform the Defendant at some point that he could be extradited to Mexico, but also stated that he did not tell the Defendant that the decision whether to

extradite the Defendant would be contingent upon his decision to cooperate or not to cooperate.  *Id.*

Special Agent Perez acknowledged that "towards the end of the interview or when we were getting ready to leave, actually, [the Defendant] made mention that he had some medication" and that he did not know if the medication was given to the Defendant.  Tr. at 136, 151.  He also acknowledged that the Defendant asked to make a phone call to somebody who was not an attorney towards the end of the interview and that he was not permitted to do so.  Tr. at 137, 151.

## II. Discussion

### A. Motion for a Bill of Particulars

The Defendant moved, in his opening papers, for a bill of particulars detailing the specific allegations of the offense charged.  At the initial evidentiary hearing, the government informed the Court that it had filed a superseding indictment that cured many of the defects identified in the Defendant's motion.  Tr. at 3.

As a preliminary matter, the Defendant's original motion for a bill of particulars has been mooted by the filing of a superseding indictment.[1]  Moreover, on the merits, the superseding indictment provides sufficient details to meet the requirements of Federal Rule of Criminal Procedure 7(c), namely: "[i]t fulfills the Sixth Amendment right to be informed of the nature and cause of the accusation; it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth

---

[1] In this regard, the Court also notes that in the Defendant's post-hearing papers, which were filed subsequent to the filing of the superseding indictment, he did not renew his motion for a bill of particulars.

Amendment protection against prosecution for crimes based on evidence not presented to the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (internal quotation marks omitted).  For each of the three counts charged in the superseding indictment, dates, places, and actions are listed with sufficient specificity to give the Defendant notice of the crimes for which he is charged and to prevent double jeopardy on the crimes alleged.

**B. Motion to Suppress Physical Evidence**

The Defendant also moved to suppress physical evidence seized at the time of his arrest on grounds that "his arrest was not predicated on probable cause" and therefore that the seizure of his personal effects was unconstitutional.  Defendant's Motion for Suppression at 4.  The Defendant's opening papers made no factual or legal argument, and instead "request[ed] leave to make additional argument based on information obtained from or submitted to the Court by the government."  *Id.*, 10.  It is long-standing precedent that a search incident to a lawful arrest may be performed without a separate search warrant.  *See United States v. Robinson*, 414 U.S. 218, 224 (1973).  The Defendant having made no additional argument in his post-hearing submissions and having pointed to no facts that would undermine the apparently valid arrest warrant issued by Magistrate Judge Fox, this claim is denied.

**C. Motion for Discovery**

In his opening brief, the Defendant moved for discovery of all statements made by co-defendants and for discovery of "all materials that may be subsumed under Fed. R. Crim. P. 16(a)(1)(A), (B), (F) and (G)."  Defendant's Motion for Suppression, at 17.  In light of counsel for Defendant's representations, at the hearing, that he was abandoning

11

this motion, Tr. at 162, the Defendant's motion for discovery is denied without prejudice to filing this motion at a future date.

**D. Motion to Suppress Post-Arrest Custodial Statements**

It is the Defendant's contention that "the agents improperly coerced Mr. Dominguez-Gabriel to make his statements, rendering his statements involuntary," and thus that those statements must be suppressed.  Defendant's Post-Hearing Memorandum (hereinafter "Def. 2d Mem.") at 14.  The suppression of coerced statements long pre-dates the *Miranda* rule and its progeny, and was mandated as early as 1783 in English courts.  *See* 2 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE §6.2(a) (3d ed. 2007) (citing *The King v. Warickshall*, 168 Eng. Rep. 234 (K.B. 1783)).  In this country, the rule excluding coerced confessions dates to *Bram v. United States*, 168 U.S. 532 (1897).[2] Thus, regardless of whether a defendant is properly advised of his *Miranda* rights, a statement must be suppressed if it is the product of governmental coercion.  *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991).

In evaluating whether a statement was coerced, the Second Circuit has said that courts must conduct "a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials."  *Id*. at 99; *see also Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) ("We have said that the question in each case is whether the defendant's will was overborne at the time he confessed."); *Terry v. LeFevre*, 862 F.2d 409, 413 (2d Cir. 1988) ("The test of voluntariness of confessions is whether an examination of all the

---

[2] *Bram*'s holding is, however, broader: "[a] confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."  *Id*. at 543 (internal quotation marks and citations omitted).

circumstances discloses that the conduct of 'law enforcement officials was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined." (internal quotation marks and citations omitted)).  Where the police use physical violence or deprivation of sleep or food to induce a confession, the caselaw is unambiguous that any resulting statements must be suppressed.  *See*, *e.g.*, *Brooks v. Florida*, 389 U.S. 413, 414 (1967) (suppressing statements made after defendant was held in a cramped, unsanitary cell for two weeks, with only "12 ounces of thin soup and eight ounces of water" provided each day); *Reck v. Pate*, 367 U.S. 433, 441 (1961) (suppressing statements made where defendant "was without adequate food, without counsel, and without the assistance of family or friends" and "physically weakened and in intense pain"); *Brown v. Mississippi*, 297 U.S. 278, 282 (1936) (suppressing statements where defendants "were laid over chairs and their backs were cut to pieces with a leather strap with buckles on it, and they were likewise made by the said deputy definitely to understand that the whipping would be continued unless and until they confessed"). However, when the police use threats or insinuations during their interrogation, without accompanying physical harm or deprivation, the question of whether resulting statements must be suppressed must be examined carefully.  *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 285-87 (1991) (emphasizing that *Bram*'s blanket prohibition is no longer the standard for evaluating statements made as a result of government threats and noting that the issue presented of physical threats involved a "close question").

In *Arizona v. Fulminante*, the Supreme Court considered whether a credible threat of physical violence was coercive, rendering a confession involuntary.  Following the brutal murder of his eleven-year-old stepdaughter, Oreste Fulminante became a suspect in

her killing.  *Id*. at 282.  No charges were filed, however, and Fulminante relocated from Arizona to New Jersey.  *Id*.  After moving to New Jersey, Fulminante was convicted on federal charges of possession of a firearm by a felon.  *Id*.  While serving his sentence, he became friends with another inmate, Anthony Sarivola, who, unbeknownst to Fulminante, was a paid informant for the FBI.  *Id*. at 283.  Sarivola told Fulminante that he had heard rumors that Fulminante was suspected of murdering a child in Arizona and "that he knew Fulminante was 'starting to get some tough treatment and whatnot' from other inmates because of the rumor."  *Id*.  Sarivola then told Fulminante that he could protect Fulminante from the other inmates, but only if Fulminante told him about the murder.  *Id*.  Fulminante then confessed to Sarivola that he had sexually assaulted his stepdaughter and then killed her.  *Id*.

In considering whether Fulminante's confession to Sarivola was voluntary, the Court emphasized that "a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient."  *Id*. at 287.  The Court then accepted the finding of the Arizona Supreme Court that the threat to Fulminante, namely that unless he confessed, Sarivola would leave him to fend for himself in an environment where violence is frequently directed at those involved in crimes against children, was a credible threat of physical violence.  *Id*. at 287-88.  In accepting this finding, the Court cited *Payne v. Arkansas*, 356 U.S. 560 (1958), a case in which a young African-American man, suspected of murdering a white man, was promised protection from an angry mob that had gathered outside the city jail where he was held, but only if he confessed to the murder.  *Id*. at 564-66.  In that case, the Court concluded that the defendant had been coerced, reasoning: "[t]hat petitioner was not physically tortured affords no answer to the

14

question whether the confession was coerced, for there is torture of mind as well as body; the will is as much affected by fear as by force."  *Id*. at 566 (internal quotation marks omitted).

In this case, the Defendant contends that he was coerced by the agents when they: (1) referenced the seriousness of the crime for which the Defendant had been arrested and the lengthy prison sentence he might face; (2) invoked SIEDO; (3) mentioned the possibility of extradition to Mexico; (4) questioned him in English; and (5) denied him his medications.  Def. 2d Mem. at 14.  Additionally, the Defendant argues that he "was not advised of his rights, if at all, until well into the interview."  Def. 2d Mem. at 15.  As to the *Miranda* warnings, the agents testified credibly and in great detail that, at the outset of the interview, Mr. Dominguez-Gabriel was first read his *Miranda* rights in Spanish and confirmed that he understood the warning.  The documentary evidence introduced at trial – the *Miranda* card in Spanish, signed by several of the agents and the Defendant – is also strong evidence that, contrary to his declaration, the Defendant was advised of his rights as required by *Miranda*.  The Court thus credits the agents' testimony and documentary evidence in concluding that the Defendant was advised of his constitutional rights prior to being questioned.  Because the Defendant was advised of his *Miranda* rights, the sole remaining issue is whether the statements he made were voluntary or coerced.

If the reference by Agent Perez to SIEDO was a "credible physical threat," then *Fulminante* requires suppression of statements made afterwards.  499 U.S. at 287.  To determine whether it was a credible threat, it is appropriate to look to the Defendant's condition, the setting, and the conduct of the interrogators.  *Anderson*, 929 F.2d at 98.

Here, none of the agents said that they would take steps to cause the extradition of the Defendant, or suggest that the decision to extradite the Defendant would be within the agents' control.  Most importantly: Special Agent Perez did not suggest or imply that extradition to Mexico would be contingent upon the Defendant's cooperation, and none of the agents suggested that they would take actions to cause the Defendant to be returned to Mexico. Special Agent Perez testified that he "did tell him at some point he could be extradited back to Mexico, but I didn't say that that would be contingent upon him cooperating or not cooperating."  Tr. at 134.  The Court notes that individuals facing extradition are entitled to an extradition hearing and numerous other procedural protections.  *See* 18 U.S.C. §3184; Charles Doyle, Cong. Research Serv., Extradition To and From the United States: Overview of the Law and Recent Treaties, Order Code 98-958 A, at 21-24 (2007).[3]  Whether the Mexican government will request the extradition

---

[3]  The purpose of an extradition hearing is to determine whether:  "(1) the crime is extraditable; and (2) there is probable cause to sustain the charge." *See Corneljo-Barreto v. Seifert*, 218 F.3d 1004, 1009 (9th Cir. 2000).

Additionally, the Court notes that the United States became a party to the United Nations Convention Against Torture ("CAT"), in 1994.  CAT prohibits any individual from being deported to a country where there are substantial grounds to believe the individual would be in danger of being tortured.  Section 2422 of the Foreign Affairs Reform and Restructuring Act ("FARR") (codified as Note to 8 U.S.C. § 1231), implemented Article 3 of CAT.  Section 2422(a) states:  "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."

The Court further notes that the United States is obligated, by treaty, to "extradite, subject to the provisions of this Treaty, persons who the competent authorities of the requesting Party have charged with an offense or have found guilty of committing an offense, or are wanted by said authorities to complete a judicially pronounced penalty of deprivation of liberty for an offense committed within the territory."  Extradition Treaty Between the United States of America and the United Mexican States, U.S. – Mex., Art.I (1), May 4, 1978, 31 U.S.T. 5059.  The Extradition Treaty also provides for the extradition of individuals who have committed offenses "outside the territory of the requesting Party" in certain circumstances.  *Id*. at Art. I(2). Additionally, the Extradition Treaty between Mexico and the United States provides for extensive procedural protections.  *Id*. at Art. 10.

of the Defendant at some future point is something that no party in this case can know, but it was not improper for Special Agent Perez to have advised the Defendant of the seriousness of the Defendant's situation, including the possibility of extradition, pursuant to the United States' treaty obligations.

To the extent that Special Agent Perez referenced SIEDO, it was to make clear to the Defendant that he was in a far better position in the United States than he would have been in Mexico.  Tr. at 153.  Special Agent Perez explained: "[W]hat led up to [the SIEDO exchange] . . . was that I told him that the reason that he was in custody in the United States and not in Mexico was largely because of efforts that I made, that I made the decision to have him taken into custody in the United States because he would be more apt to cooperation [sic] in the United States. . . .  That's when he started joking, and he seemed to think that the whole thing was funny.  And that's when I told him, I said, If you were in custody in the SIEDO, you wouldn't be laughing."  Tr. at 153.  Agent Perez's comment appears to have been made in response to the Defendant's laughter when Perez advised him that he, Perez, had taken steps to ensure that the Defendant was arrested in the United States.  Furthermore, this part of the conversation occurred at the end of the one or two hours of questions.  Unlike the threat in *Fulminante*, which was to expose the defendant to the brutalities of prison violence, there is no evidence that Perez made the statement as a threat here, or that he said that only by confessing could the Defendant avoid extradition to Mexico or imprisonment by SIEDO.  The evidence introduced at the hearing shows that the Perez made no statements to threaten the Defendant that he would be placed in a position dangerous to his person, but attempted to make sure the Defendant knew that it was he who had placed the Defendant in a more

favorable situation and because he feared the Defendant did not understand the seriousness of the offenses for which he could be charged.  These actions, without a threat of exposing the Defendant to physical harm, are not grounds for suppression.  Even when viewed in the broader context, these statements do not rise to the level of coercion.  Moreover, the Defendant's response, following the SIEDO comment, that if Perez "really had balls, that [Perez] would go with him down to Colombia," makes clear that the Defendant's will had not been overborn.  Tr. at 133.  Nor is there any evidence that he then provided evidence to the agents.

The Defendant also complains that his medicine was not provided to him; but at the evidentiary hearing, Agent Moynahan, who was present during the entire interview, testified that he requested unmarked pills from his luggage, and the Customs and Border Patrol agents had to follow protocol and get a supervisor's approval before she provided him with unlabeled medicines.  Agent Moynahan also testified that he was provided with food and water but rejected the food, and that the medication was supplied as soon as was practicable after it was requested.  The delay was minimal and the Customs agents were understandably reluctant to provide a suspect in their custody with unmarked, unlabelled pills.

The Defendant complains that some of the questioning was in English.  However, the government submitted substantial evidence showing that the Defendant was, at a minimum, at ease communicating in English: the agents testified that he was able to respond appropriately and promptly to questions asked of him in English; and a telephone transcript of a prior telephone call between the Defendant and a DEA agent demonstrates that the Defendant is capable of fluent conversation in English.  *See* gov't ex. *2*.

Finally, the Defendant complains that the agents created a coercive environment when they mentioned the gravity of the offense and the possibility of a lengthy prison sentence and then told him that if he cooperated he might benefit.  But the Second Circuit has made clear that simply stating that cooperation may help a defendant facing a lengthy sentence is not enough to render a statement subsequently made involuntary.  *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002); *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive.").  And when the agents told the Defendant that he had been arrested on a serious offense for which he might face a lengthy jail sentence, they were simply informing him of the facts of his situation.  *See United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (holding that once a suspect "had been advised of his rights, the agents were free to discuss with him the evidence against him and the reasons why he should cooperate"); *Green v. Scully*, 850 F.2d 894, 903-04 (2d Cir. 1988) (holding that police officials' references to the electric chair, while improper, did not render a confession involuntary); *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir. 1974) (holding that "[i]t was quite proper in the course of such discussion to mention the situation which Pomares faced," including informing the defendant he faced heavy penalties for drug smuggling).

Even taken together, none of these circumstances rise to the level of coercion or suggest that the Defendant's "will was overborne."  *Fulminante*, 499 U.S. at 288.  Again, the situation does not come close to the level of coercion that was present in *Fulminante*, where the defendant was in prison and fearful of the violent and brutal treatment often imposed by fellow inmates upon those accused or convicted of crimes against children.

The evidence at the hearing does not support the Defendant's claims, and the government has more than met its burden of showing that neither the setting nor the agents were coercive, nor does the evidence show that the Defendant was particularly vulnerable. The record shows that the Defendant's statements made during the questioning were voluntary and not coerced.  Therefore, the motion to suppress post-arrest statements is denied.

IT IS SO ORDERED.

Dated:  New York, New York
      May 12, 2010

Robert P. Patterson, Jr.

U.S.D.J.

20

Copies of this order were faxed to:

**Robert Joel Krakow**
Office of Robert J. Krakow
1205 Franklin Avenue
Suite 110
Garden City , NY 11530
(516) 354-3300
Fax: (646)-349-1771

**Michael Max Rosensaft**
United States Attorney SDNY 1 Saint Andrew
Department of Justice
One Saint Andrew's Plaza
New York , NY 10007
(212)-637-2366
Fax: (212)-637-2527

**Benjamin Naftalis**
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York , NY 10007
(212) 637-2456
Fax: (212) 637-2527