UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                                        09 CR 157 (RPP)

                        - against -
                                                                        **OPINION & ORDER**

HECTOR DOMINGUEZ-GABRIEL,

                                        Defendant.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

**I.  Introduction**

      Defendant Hector Dominguez-Gabriel ("Dominguez-Gabriel") moves for a judgment of

acquittal pursuant to Fed. R. Crim. P. 29(c) and for a new trial pursuant to Fed. R. Crim P. 33.

On December 14, 2010, Dominguez-Gabriel was convicted of 1) conspiring to commit money

laundering, in violation 18 U.S.C. § 1956 ("Count One"), 2) conspiring to distribute cocaine or

possess cocaine with the intent to distribute it, in violation of 21 U.S.C. § 846 ("Count 2") and 3)

conspiring to distribute cocaine knowing or intending that it would be imported into the United

States, or into waters within a distance of 12 miles from the United States, in violation of 21

U.S.C. § 963 ("Count Three"). The jury also found that both narcotics conspiracies involved over

five kilograms of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A) and 21 U.S.C. §

960(b)(1)(A).

      On December 14, 2010, following the close of evidence but before submission to the

jury, Dominguez-Gabriel moved this Court for a judgment of acquittal under Fed. R. Crim. P.

29(a). The Court denied the motion. In connection with the motion, Dominguez-Gabriel moved

to exclude certain overt acts from the indictment. The Court granted this application with the Government's consent and ordered the redaction of a number of overt acts from the indictment on the grounds that the Government failed to produce any evidence during trial to support those specific allegations. Overt acts "a", "b", "c", "i", "j" and "k" in Count One and overt acts "a", "b", "c", "g", "h", "i", "j", "k", "q", "r" and "s" in Counts Two and Three were redacted from the indictment. The redacted indictment was provided to the jury during their deliberations.

Sixty days after verdict, on February 18, 2011, Dominguez-Gabriel renewed his motion for an order granting a judgment of acquittal pursuant to Fed. R. Crim P. 29(c) and made a motion for a new trial pursuant to Fed. R. Crim. P. 33. (Def. Memo at 1.) The Government submitted its opposition papers on March 3, 2011. Dominguez-Gabriel is scheduled to be sentenced on Wednesday, April 27, 2011.

For the following reasons Defendant's motions are denied.

## II.  Evidence Presented at Trial

Dominguez-Gabriel argues that the evidence produced by the Government at trial is "insufficient to sustain a conviction under the three counts of the indictment," and as such, asserts that the Court should grant his motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c), or in the alterative, grant his motion for a new trial pursuant to Fed. R. Crim. P. 33. (Def. Memo at 5.) As demonstrated below, the Government put forth substantial evidence corroborated by witness testimony, recorded telephone calls, and other records, such that a reasonable jury could have found Dominguez-Gabriel guilty on all three counts charged.

**Testimony of Manuel Alexander Araujo and Special Agent Gregory Tanella**

Manuel Alexander Araujo ("Araujo" or "Alex"), one of the Government's two key cooperating witnesses, was arrested on February 20, 2007 with $1.5 million in narcotics proceeds

in New York City. Drug Enforcement Agency ("DEA") agents had been monitoring Araujo's mobile phone, through a court ordered wiretap, from late 2006 up through his arrest in 2007. At trial, the Government presented the transcripts of ten recorded calls, ranging from December 2006 to February 21, 2007, between Araujo and Dominguez-Gabriel, in which the two discussed the purchase and sale of narcotics and their methods for laundering narcotics proceeds. Three of these calls, GX102T-9, GX102T-10 and GX102T-11, were recorded after Araujo had been arrested by the DEA and had agreed to serve as a cooperator. These calls corroborate Araujo's testimony at trial.

Specifically, during these calls, Araujo and Dominguez-Gabriel discussed 1) asking "the man" for a "[f]ifteen or twenty thousand [dollar advance], so [Araujo] can make some, some holes in two vehicles" to conceal cocaine during transport (GX102T-1 at 6); 2) whether Araujo should send Dominguez-Gabriel "another dude" to help Dominguez-Gabriel in the distribution of large amounts of cocaine in the United States (GX102T-3 at 13); 3) the price of cocaine by the kilogram (GX102T-3 at 49 (ALEX: And the other day I took something that was really fucking expensive. At nineteen five hundred and nineteen...)); 4) the arrest of Angel Sanchez, an associate of Araujo and the Defendant's, in Dobbs Ferry, New York with $1 million (GX102T-1 at 8-11; Tr. at 572)[1]; 5) the names of various co-conspirators including "El Mamut," "El Ingeniero," Eddie, and Pablo (See GX102T-3, GX102T-6); 6) a drop-off of $35,000 cash, proceeds of narcotics supplied by Dominguez-Gabriel's associate El Ingeniero (GX102T-6 at 4 (HECTOR: I think that they're going to give you thirty-five. ALEX: Yeah, but the ages. The a...the number... HECTOR: No, no, no. No, no, no, no, no, it's money, it's money.)); 7) the

---

[1] "Tr." refers to the transcript of the trial in United States v. Hector Dominguez-Gabriel held before this Court between December 6 and December 14, 2010.

methods for depositing the cash into various bank accounts in order to conceal its illicit source (GX102T-8 at 2 (HECTOR: Do you want me to send you the accounts where you're going to deposit?...Uh you don't care if it's all Bank of America?…ALEX: Because it's only thirty-five, which is nothing. That can be done all at once.) and 8) a larger drop-off of cash proceeds estimated to be approximately $1 million (GX102T-8 at 3 (HECTOR: [T]he other guy is going to call you on behalf of Guido, to see if they give you a million today.));

These conversations, some recorded almost two years before Dominguez-Gabriel's arrest, corroborate Araujo's testimony at trial regarding his involvement with the Defendant and their joint ventures in buying and selling cocaine and in laundering the proceeds of cocaine sales.

Araujo testified at trial that he was first introduced to Dominguez-Gabriel in "about the late '90s, the year 2000" through Abelardo and Israel Espinoza, friends of Dominguez-Gabriel's whom Araujo met in Miami, Florida. (Tr. at 409.) Araujo met with the Espinozas to discuss "specific prices…places and quantities" with respect to cocaine distribution. (Id. at 411.) Soon into their conversation, Araujo testified, Abelardo Espinoza told Araujo that "his best friend, his associate, was actually the supplier" and put Araujo on the phone with "a gentleman by the name of Hector." (Id.) Araujo testified that "Hector" was Hector Dominguez-Gabriel, the Defendant. (Id. at 412.) Araujo and Dominguez-Gabriel had their first meeting at the Hard Rock Café in Acapulco, Mexico about two months after this initial conversation. (Id. at 412-13.) According to Araujo, he and Dominguez-Gabriel talked about "quantities [of cocaine]…prices… locations, drop offs and pick up points." (Id. at 414.)

Araujo testified that his first drug deal with Dominguez-Gabriel was in approximately 2001. (Id. at 415.) Araujo, Dominguez-Gabriel, and Dominguez-Gabriel's driver, "El Viejo", met at a hotel in Dallas, Texas to discuss transporting cocaine from Dallas to New York.

4

According to Araujo, the three discussed that El Viejo would "put the cocaine in the trunk next to the hazard lights in the back of the car…and drive up [to New York] according to the instructions." (Id. at 415-16.) Araujo would then meet El Viejo at a specific garage in New York and pick up the cocaine. (Id. at 416.) Araujo testified that Dominguez-Gabriel had received the cocaine from a man by the name of "El Mamut" who lived in Arizona. (Id.) According to Araujo, everything went according to plan and Araujo received approximately two kilograms of cocaine from El Viejo in New York. (Id. at 417.) Araujo paid El Viejo $17,500 per kilogram of cocaine and $2,000 for transporting the drugs to New York. (Id.)

Following the success of this first delivery, Araujo testified that he and Dominguez-Gabriel discussed their future plans, including trips in which Araujo would serve as the driver. (Id. at 418.) On another trip, Araujo first drove to Nogales, Mexico where he met with an associate of Dominguez-Gabriel's who placed a secret compartment in the gas tank of his vehicle to store cocaine during transport. (Id. at 419.) This is the same type of compartment referenced by Araujo in his 2006 recorded conversation with Dominguez-Gabriel. (GX102T-1 at 6.) After the compartment was installed, Araujo waited for about a week in Phoenix, Arizona for a delivery of cocaine from El Mamut. Once Araujo received the cocaine, he drove it to Baltimore, Maryland. (Id. at 419, 421.) All together, Araujo testified that he participated in about a "dozen, a dozen and a half" trips with Dominguez-Gabriel in the early years of the 2000s. (Id. at 423.) In total, Araujo testified that he picked up between 50 and 60 kilograms of cocaine from Dominguez-Gabriel and El Mamut for delivery to Baltimore and New York. (Id.)

Araujo testified that in approximately 2002, he traveled to Guadalajara, Mexico "at the behest of Hector to meet an associate called 'El Ingeniero.'" (Id. at 424.) Dominguez-Gabriel told Araujo that he wanted him to meet El Ingeniero because "he was a high-ranking member of

a cartel and …a good drug supplier." (Id. at 425.) The day after this meeting, Araujo and Dominguez-Gabriel received ten kilograms of cocaine from El Ingeniero. (Id.) Araujo testified that he could tell from the packaging of the cocaine that it had originated from Colombia, (id. at 426), and that he and Dominguez-Gabriel arranged to deliver the cocaine to El Mamut who brought it into Arizona, from Mexico, via bus. (Id. at 427.) Araujo continued to receive cocaine in Arizona through this route for a period of four to five months. (Id. at 436.) Araujo testified that on his final trip from Arizona, he was stopped by state police in Oklahoma, arrested, and charged with drug trafficking. (Id. at 436.) Araujo was in jail for approximately two months before Dominguez-Gabriel posted his bail and bought him a ticket to Miami, Florida, where the two met. (Id.) Araujo testified that he then returned to New York for an eight to twelve month period while his criminal case in Oklahoma was pending. (Id. at 438). In approximately 2004, Araujo learned that a sentencing date had been scheduled in his Oklahoma drug trafficking case. (Id. at 438-39.) Araujo subsequently contacted Dominguez-Gabriel for assistance and, according to Araujo, Dominguez-Gabriel bought him a one-way airplane ticket to Acapulco, Mexico in order to help him flee from potential imprisonment. (Id.) Araujo was in Mexico for approximately eight months and worked for Dominguez-Gabriel's business, Transmisión de Services Mexicanos ("TSM"), during this time. (Id. at 439-40.) Araujo further testified that while he was in Mexico, he picked up two kilograms of cocaine, paid for by Dominguez-Gabriel, packaged the drugs, and arranged for them to be loaded onto a Carnival Cruise Lines ship bound for Fort Lauderdale, Florida. (Id. at 444-47,449.) Araujo also recounted a transaction during this period involving two kilograms of cocaine that were sent by Dominguez-Gabriel to the United States in an airborne delivery, packaged with flowers. (Id. at 543-44.)

In 2005, Araujo left Mexico and illegally reentered the United States through the Texas border. (Id. at 451.) Upon his entry into the United States, Araujo returned to New York where he met up with another drug associate, Angel Sanchez. (Id. at 455.) Araujo worked with Sanchez to adulterate cocaine quantities. (Id. at 455-56.) Araujo testified that "adulterating" or "altering" cocaine meant enhancing cocaine quantities through various chemical reactions of "acetone…different agents [and] different powders." (Id. at 456.) Through these reactions, Araujo testified that he was able to turn one kilogram of cocaine into a kilogram and a half or even two kilograms of cocaine. (Id. at 455.)

In approximately 2006, Araujo testified that he spoke with Dominguez-Gabriel who told him that he had met a "real powerful drug dealer in Mexico." (Id. at 458.) Dominguez-Gabriel asked Araujo to travel to Mexico to meet with this drug dealer, Pablo. Araujo testified that he was uncomfortable traveling because of his fugitive status, (id. at 458-60), and thus asked Sanchez to travel to Mexico on his behalf. (Id. at 460.) Sanchez complied. (Id.) The day after Sanchez returned from Mexico, Araujo testified that Sanchez received 50 kilograms of cocaine in New York. (Id. at 462.) Araujo testified that Sanchez received two more shipments from Pablo and Dominguez-Gabriel – a 50 kilogram shipment of cocaine approximately two weeks after the first shipment and a 120 kilogram shipment of cocaine approximately two weeks subsequent to that. (Id. at 474-75.) Sanchez was eventually arrested in 2006 with $1 million in Dominguez-Gabriel's drug proceeds in Westchester County. (Id. at 503-04, 509-10.) In a recorded conversation between Araujo and Dominguez-Gabriel in December 2006, Dominguez-Gabriel asks Araujo how to get online photographs of Sanchez and of the $1 million seized in Dobbs Ferry, New York in order to prove the seizure took place. (GX102 T-1 at 9-10.) Araujo informs

7

Dominguez-Gabriel that "[a]t the Westchester District Attorney Office, you'll see the photos and all." (Id. at 10.)

 Araujo also testified that during 2006, Dominguez-Gabriel offered him the position of making "cash deposits" of the proceeds from the narcotics sales. (Id. at 476.) Dominguez-Gabriel told Araujo that there were people that owed his boss "Pablo money from the cocaine shipments, and…that [Araujo] would be responsible for picking up the money owed to Pablo and depositing it into different bank accounts." (Id. at 476.) Araujo testified that Dominguez-Gabriel told him to call him "at the end of the day when [he] was done [depositing the cash] to go over every single account and every single transaction, every single deposit [he] made so the dollar amounts would coincide." (Id. at 478.) Dominguez-Gabriel told Araujo that he "wanted to make a 7 percent commission on the money being brought back to Pablo." (Id. at 481.) Dominguez-Gabriel instructed Araujo to begin making the deposits and to ensure that cash deposits were under the $10,000 limit so as "to not arouse any suspicion." (Id. at 477.) Araujo testified that Dominguez-Gabriel told him to go a "step further" and make the deposits in amounts less than $5,000 and to get creative with the deposits by submitting "4,191.72" instead of "round" deposits such as "$4,500" or "$5,000." (Id. at 478, 483). According to Araujo, Dominguez-Gabriel would tell him what bank accounts to deposit the money into. (Id. at 478.) Araujo testified that he made more than two dozen pick-ups of money that he would then deposit. (Id. at 481.) The deposits were made into 21 different bank accounts in various New York banks. (Id. at 346, GX324A, GX324B.) In total, Araujo testified that he deposited approximately $915,225 at the instruction of Dominguez-Gabriel. (Tr. at 385.)

 Araujo also testified that the names on the accounts where he would deposit this cash had direct connections to Dominguez-Gabriel. For example, one account was under the name of

Abelardo Espinosa – the individual whom Araujo met in Miami and who first introduced Araujo to Dominguez-Gabriel. (Id. at 489.) Another account was named Comercializadora Mexicana de Garay, which Araujo testified was a subsidiary of Dominguez-Gabriel's company, TSM. (Id. at 489-90.) A third, Vidmar Imports Products and Services, was known by Araujo to be connected to a "friend of Hector's named Vidmar." (Id. at 490.)

Araujo also testified that in 2006, Dominguez-Gabriel asked him to go to Atlanta, Georgia to meet Dominguez-Gabriel's brother, "Cejas", "Topu", "Jesus," or "Chucho". (Id. at 604-05, 900.) Dominguez-Gabriel told Araujo that he wanted Araujo to meet Cejas because Cejas had "started his own drug distribution and [Dominguez-Gabriel] wanted [Araujo] to teach his brother how to package the kilograms of cocaine for shipment." (Id. at 605.) Araujo testified that while he was in Atlanta with Cejas, he also met "a gentleman by the name of Patambo" who was distributing cocaine with Cejas. (Id. at 609.) Araujo described Patambo as "a small gentleman, about 5 foot 2. He was handicapped and had problems walking." (Id.) Araujo and Patambo first spoke over the phone and discussed "the business that [they] both had in common with Hector Dominguez[-Gabriel]," namely, "drug trafficking and money deposits." (Id. at 610.)

On February 12, 2007, Dominguez-Gabriel called Araujo, told him to buy an international calling card, gave him an international telephone number belonging to "Guido" and instructed Araujo to call Guido if Guido hadn't called Araujo by 2:00pm the next day. (See GX102T-4 at 2-3.) Dominguez-Gabriel also told Araujo that he should call him immediately after receiving Guido's telephone call and that Guido would be giving Araujo $2 million. (Id.) Finally, Dominguez-Gabriel told Araujo to accept the delivery at home and not "out on the street." (Id. at 6.) While Dominguez-Gabriel initially told Araujo that the delivery would be $2 million, he later, on February 19, 2007, told Araujo that Guido would send just $1 million.

9

(GX102T-8.) Dominguez-Gabriel told Araujo to deposit this money in a manner similar to his previous deposits. (GX102T-8, GX102T-9.)  Araujo testified that Dominguez-Gabriel identified Guido as "an associate of a well-known cartel in Colombia" and  told Araujo that Guido "had access to drug dealers that needed money sent back to Colombia." (Tr. at 584.) On February 16, 2007, Dominguez-Gabriel told Araujo he would be receiving $35,000 from someone on behalf of El Ingeniero. (GX102T-6 at 4.)

On or about February 20, 2007, Araujo picked up $1.5 million packed in three duffel bags (GX210-212) in New York City, was arrested by federal agents, and immediately began to cooperate with the DEA, assisting them in the seizure of $35,000. (Tr. 216-21, 612-22.)

Special Agent Gregory Tanella ("Agent Tanella"), a twelve-year veteran of the DEA, was one of the agents present at Araujo's arrest. (Id. at 173.) Agent Tanella testified that in February of 2007, he received information of a "money pick-up" of drug proceeds which was going to occur, and that he subsequently established surveillance on Araujo. (Id. at 215.) Members of Agent Tanella's team observed the "money pick-up" and Araujo was arrested. (Id. at 215-16.) Agent Tanella testified that at the time of the arrest, he observed three duffel bags in the rear passenger seat of Araujo's vehicle. (Id. at 216.) The duffel bags contained approximately $1.5 million cash. (Id. at 219.) Agent Tanella recounted that he and Detective Pedro Crespo took Araujo to DEA offices where they proceeded to interview him. (Id. at 221.) During the questioning, Araujo agreed to cooperate with the agents and informed Agent Tanella that a second pickup of drug proceeds was supposed to occur that day. (Id. at 221-22.) Araujo, under the instruction of the agents, coordinated the pickup such that agents were able to seize approximately $35,000 cash. (Id. at 223.) Araujo's testimony regarding Dominguez-Gabriel's involvement with both the $1.5 million and $35,000 pick-ups is corroborated by the recorded

wiretap conversations between Dominguez-Gabriel and himself. (GX102T-6 at 4-5, GX102T-8 at 3, GX102T-9 at 4.)

Agent Tanella also testified that he answered Araujo's cell phone as least twice while Araujo was in DEA custody in order to "see who else was still calling him and to elicit more information to continue [the] investigation." (Id. at 224.) The first call, at 2:15pm on February 21, 2007, was from a man who identified himself as "Hector Gabriel," and whose voice  Agent Tanella was able to indentify as being that of Dominguez-Gabriel. (GX102T-12, Tr. at 225.) During this call, Dominguez-Gabriel asked to "talk to [his] friend." (GX102T-12.) Thirty-five minutes later, Agent Tanella answered a second call to Araujo's phone from Dominguez-Gabriel. During this call Dominguez-Gabriel discussed the large amount of money that had been seized by the DEA, (GX102T-13 at 4), asked who ratted him out (GX102T-13 at 4 (HECTOR: [W]ho is the snitches?)), and offered Agent Tanella 10% of the funds (GX102T-13 at 9 (HECTOR: You can take up [to] ten percent about that, and let me ….))

**Testimony of David Marin**

The Government also had the benefit of testimony from another cooperating witness, David Marin. Marin testified that he was first introduced to Dominguez-Gabriel in Mexico City, Mexico in 2007 through Dominguez-Gabriel's brother, Cejas. (Id. at 893-94.) Thereafter, Marin traveled to Mexico City, Mexico to meet with Dominguez-Gabriel and discuss the importation of cocaine into the United States and its distribution in and around North Carolina. (Id. at 894-98.) Marin testified that in 2008, he received 12 kilograms of cocaine in Winston-Salem, North Carolina, from Dominguez-Gabriel. (Id. at 898-902.) Marin testified he resold the cocaine for approximately $25,000 per kilogram, a profit of between $1,500 to $2,000 per kilogram. (Id.) Marin explained that "each time he had an amount [of money from the cocaine sales he] would

11

call [Dominguez-Gabriel] and [Dominguez-Gabriel] would send [a] person to pick up the

money." (Id. at 902.) With the first kilogram of cocaine sold, Marin testified that Dominguez-

Gabriel told him to pay $8,400 to "those females who had brought the drug[s]." (Id.) Marin

further testified that he worked on this transaction with another "person who was with [him and]

who had been sent by Don Hector" – a man by the name of "Patanbo." (Id. at 899.) According to

Marin, Pantanbo "came on instructions by Don Hector so that when I began selling the first kilos

[of cocaine] I would give him some money." (Id. at 899-900.) Marin testified that he gave

Patanbo "$17,000 or $19,000" after his next set of sales. (Id. at 903.) Marin explained that he

met Patanbo through Cejas, at the end of 2005 when Marin, Patanbo and Cejas were selling

marijuana and cocaine. (Id. at 900-01.)  Marin described Patanbo as "kind of chubby" and, like

Araujo, identified Pantanbo as "the guy who limps, with the limp on his leg."[2] (Id. at 930, 950.)

Marin testified that "two days later or the next day" after he gave Pantanbo the proceeds, he "had

about $65,000" from cocaine sales which he delivered to "a man and woman" selected by

Dominguez-Gabriel. (Id. at 902-06.) He then delivered another sum of "about $45,000" from the

sale of kilograms of cocaine to the man and woman. (Id. at 905-06.) Marin testified he was never

able to fully repay Dominguez-Gabriel, however, because his final payment of $130,000 was

seized from the man and woman in 2008 by law enforcement.  (Id. at 906-07.)

    Marin testified that in mid to late-2008, he traveled to Mexico City to discuss the loss of

the $130,000 with Dominguez-Gabriel. (Id. at 908.) In Mexico City, Marin met with

Dominguez-Gabriel and a Colombian man whom Dominguez-Gabriel introduced as the owner of

the drugs. (Id. at 910-11.) In order to partially settle his debt with Dominguez-Gabriel, Marin

---

[2] While Araujo testified  that he spoke to a man named "Patambo" and Marin testified that he worked with a man
named "Patanbo," the identifying characteristics testified to by both men indicates that they are referring to the same
individual.

agreed to give him two trucks and one boat. (Id. at 916.) Once Marin returned to the United

States, he had further conversations with Dominguez-Gabriel regarding the repayment of his

debt, and Marin agreed to "deposit money" – "pick up a certain amount of money, and then…go

to different banks and make deposits" for Dominguez-Gabriel. (Id. at 917.) Marin testified that

Dominguez-Gabriel told him to "pick up the money at El Pollo's house" and that Dominguez-

Gabriel "would provide [him] with bank account numbers" and that Marin would have to go and

deposit the money. (Id. at 919, 921.) Marin testified that he understood from El Pollo that the

money "came from [the sale of] some little kilos [of cocaine] that Don Hector had given to him."

(Id. at 922.) Marin further testified that Dominguez-Gabriel instructed him not to deposit more

than $10,000 in one single account to avoid having a "problem" with "the Feds." (Id.) Marin said

he picked up money, ranging from $17,000 to $65,000 cash, "more than 20 times" in 2008 in

Atlanta, Georgia and Winston-Salem, North Carolina and that he and Patanbo would make

deposits in Bank of America, Wachovia, and Sun Trust accounts according to directions from

Dominguez-Gabriel. (Id. at 920, 923, 925.) After making the deposits, Marin testified, he would

call Dominguez-Gabriel and "confirm for him that those deposits had been made." (Id. at 917.)

Marin was arrested in February 2009. (Id. at 918-28, see also GX104T-1, GX104T-2, GX104T-

3.)

**Testimony of DEA Intelligence Research Specialist Eileen Moynahan**

Dominguez-Gabriel was arrested on June 18, 2009 at Miami International Airport in

Miami, Florida. (Tr. at 231, 1053.) Upon his arrest multiple cellular phones and two notebooks

were seized from his person. The cellular phones's directories had the names and numbers of

other coconspirators, (GX220-24) and the notebooks appeared to be drug and money laundering

ledgers with names of drug traffickers and amounts owed. (GX227-28.) Dominguez-Gabriel was

13

advised of his rights and interviewed by law enforcement agents. (Tr. at 1053) DEA Intelligence Research Specialist Eileen Moynahan, who was part of the team that executed Dominguez-Gabriel's arrest warrant and who was present during his interview, testified as follows:

QUESTION: Can you tell us what topics were discussed during the interview?

ANSWER: We covered a number of topics. I know that the defendant was asked if he recalled speaking with Special Agent Tanella on the phone and he said he had…

QUESTION: Did you question the defendant about any money laundering activities?

ANSWER: We did. That was the main thrust of our questions. He was asked if he had ever been involved in money laundering…he answered that he had. That when he was residing in Bogota in 2007 his friend Guido…had asked him to do him a favor and to arrange for a $100,000 or $200,000 bulk currency pick up in New York, and for that service, the money pick-up and deposit, the defendant would receive $6,000 in commissions. He said he didn't find out until after the money was seized that it was actually $1.5 million.

QUESTION: Did the defendant tell you anything more about the $1.5 million pick-up? …

ANSWER: We were showing him a series of pictures of other subjects in the investigation and he identified a photo of Manuel [Alex] Araujo as Manuel Araujo, and he said that he had been using Mr. Araujo from about June 2006 through February 2007 to do bulk currency pick-ups and deposits in the U.S., and that Mr. Araujo was involved in the $1.5 million seizure [on February 20, 2007].

QUESTION: Did you ask the defendant any questions about what happened after the $1.5 million seizure?

14

ANSWER: …He said he was residing in Bogota at the time but he was invited to a

meeting in Cali, Colombia to answer to the organization that owned the money and when

he arrived at the meeting there was 20 some people. Some had machine guns and he was

taken hostage. He was forced to turn over – he had an apartment in Bogota that he gave

them as part of the lost money. He also had to turn over some other assets. That was

February 26, 2007 he said, and they actually held him until March 9, 2007.

(Id. at 1054-56.)

Dominguez-Gabriel's post-arrest statements regarding his kidnapping in Colombia by the

organization that owned the money seized by the DEA, coupled with Araujo's testimony that 1)

Dominguez-Gabriel told him that Guido, the contact for the $1.5 million seized, was an associate

of a well known drug cartel in Colombia, (id. at 584), 2) his testimony that Dominguez-Gabriel

wanted Araujo to meet El Ingeniero, the source for the $35,000 seized, because "he was a high-

ranking member of a cartel and…a good drug supplier,"(id. at 425), and 3) Marin's testimony

that Dominguez-Gabriel introduced him to a Colombian man in Mexico City who was the owner

of the drugs (id. at 910-11), lends credence to the Government's argument in summation that the

funds seized were drug proceeds and that Dominguez-Gabriel was kidnapped by the Colombian

cartel in order to answer to the organization for the loss of the $1.5 million. (Id. at 1261.)

Agent Monyhan also testified that Dominguez-Gabriel was asked about his work history

in Mexico and the United States and that he stated he worked for "ServiMex…a company owned

by a Colombian run out of Miami [and that] he ran the Acapulco branch…from 1995 through

2004." (Id. at 1057.) Dominguez-Gabriel explained that ServiMex helped Mexicans in the

United States send money back to Mexico by facilitating the pickup, deposit and transfer of cash

funds purportedly earned through selling fabrics, cigars, and used clothing. (Id. at 1057-58.)

15

**III. Legal Standard under Fed. R. Crim. P. 29(c) and 33**

Defendant's principal contention in bringing these motions is the insufficiency of the evidence put forth by the Government to sustain his three count conviction. The evidence was more than sufficient. A defendant challenging the sufficiency of evidence bears a heavy burden. See e.g., United States v. Diaz, 176 F.3d 52, 89 (2d Cir. 1999). A jury verdict must be sustained if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979.) A court may enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122,130 (2d Cir. 1999) (citation omitted).

The Second Circuit has long held that trial courts "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal citation omitted). It is only "where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." Sanchez, 969 F.2d at 1414. "Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." Id. The test is whether "it would be a manifest injustice to let the guilty verdict stand." Id. (citing United States v. Reed, 875 F.2d 107, 114 (7th Cir. 1989)). The deference accorded to a jury's verdict on a conspiracy charge is "especially important…because conspiracy, by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal citation omitted).

"In considering a [sufficiency] challenge, [the Court should] review all of the evidence presented at trial 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'" United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999) (internal citation omitted). A reviewing court must also "draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict." United States v. Tyler, 758 F.2d 66, 68 (2d Cir. 1985) (internal citation omitted).

Under Fed. R. Crim. P. 33, a trial court "may vacate any judgment and grant a new trial if the interest of justice so require." On a Rule 33 motion, the "ultimate test" is "'whether letting a guilty verdict stand would be manifest injustice....There must be a real concern than an innocent person may have been convicted.'" United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) (internal citation omitted). As in the Rule 29(c) context, "it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000) (quoting Sanchez, 969 F.2d at 1414).

## IV. Discussion

The Defendant puts forth three principal arguments in support of its Rule 29(c) and Rule 33 motions: 1) that the Government did not prove each overt act listed in the indictment; 2) that Araujo, the Government's main cooperating witnesses, gave inconsistent and uncorroborated testimony; and 3) that the Government failed to call its confidential source, Miguel Duarte to the stand, and failed to provide a "missing recording" to the Defense. The Court will discuss each argument in turn.

> **a.   The Government was not required to prove any of the overt acts listed in the indictment**

The Defendant first maintains that the Government failed to provide sufficient evidence to sustain his conviction because it was unable to prove the overt acts listed in the redacted indictment. Specifically the Defendant asserts that: 1) with respect to overt acts "a" and "b" of Count One of the redacted indictment, the Government produced "no evidence … showing that Mr. Dominguez-Gabriel owned or controlled a bank account in the Southern District of New York or that he effected a wire transfer through such an account" (Def. Memo at 7)[3]; 2) with respect to overt acts "c," "d," and "e" of Count One of the redacted indictment the "record does not establish Mr. Dominguez-Gabriel's involvement in the $1.5 million transaction [and] fails to establish that the $35,000 transaction involved narcotics proceeds" (Id. at 14)[4]; 3) with respect to overt act "a" of Counts Two and Three of the redacted indictment, the Government failed to provide corroborating evidence to Araujo's testimony on the matter (Id. at 15); 4) with respect to overt acts "b" and "c" of Counts Two and Three of the redacted indictment, the Government's key witness, Araujo, gave inconsistent testimony regarding the timeline of events (Id. at 15-20); 5) with respect to overt act "d" of Counts Two and Three of the redacted indictment, Araujo was "unable to provide last names of the individuals involved [and gave] internally contradictory" testimony; and 6) with respect to overt acts "e," "f," "g," and "h" of Counts Two and Three of the redacted indictment, "the evidence does not support the claim that Mr. Dominguez-Gabriel affected wire transfers…and the only witness claiming that the cash deposits into bank accounts

---

[3] But see, GX102T-11 at 2-4 where Dominguez-Gabriel dictates bank account numbers to Araujo, including one Sun Trust Bank account in the name of Hector Dominguez-Gabriel, 1000047741359.

[4] But see, GX102T-9 at 4. (HECTOR: Yeah. How much did they [Guido] give you? ALEX: One and a half [$1.5 million]).

was narcotics proceeds was Araujo, whose testimony is riddled with inconsistencies, internal contradiction and incompleteness in providing last names of participants and dates of transactions." (<u>Id</u>. at 23.)

Defendant's argument about the Government's failure to prove overt acts is unavailing because under Supreme Court and Second Circuit precedent, the Government need not prove *any* overt acts in order to sustain a conviction. <u>See</u> <u>United States v. Shabani</u>, 513 U.S. 10, 15 (1994) ("In order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy."); <u>United States v. Ogando</u>, 547 F.3d 102, 107 (2d Cir. 2008) (reading <u>Shabani</u> to stand for the proposition that the Government need not prove commission of any overt acts in furtherance of a conspiracy under 21 U.S.C. § 963); <u>Whitfield v. United States</u>, 543 U.S. 209, 214 (2005) (no over act requirement for conspiracy to commit money laundering under 18 U.S.C. § 1956). Furthermore, the Court granted Defendant's motion to redact from the indictment several overt acts that the Government had failed to produce any supporting evidence for so that the jury was unaware of those overt acts and thus could not have convicted on reading overt acts for which there had been no evidence. Accordingly, the jury was not prejudiced since those overt acts had no influence on them. As such, Defendant's argument that the Government's failure to prove the overt acts in the redacted indictment requires either a judgment of acquittal or a new trial must be denied.

     **b.**     **Araujo's testimony was corroborated and was inconsistent only with respect to dates, and not events**

Defendant's second argument is that the Government failed to produce sufficient evidence to support the jury's verdict because significant portions of Araujo's testimony were uncorroborated and inconsistent. (Def. Memo at 5.) This argument is also unavailing because: 1)

19

the Government provided ample evidence in the form of wiretap evidence, law enforcement testimony, and the Defendant's own post-arrest statements to corroborate Aurajo's testimony; 2) the testimony of a single accomplice is sufficient to sustain a conviction, even without corroboration, so long as the testimony is not incredible on its face, see United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003) (internal citation omitted); and 3) the portions of Araujo's testimony that were inconsistent had to do with dates long before his arrest, and not the nature of the events, and the Court must defer to a jury's determination of his credibility. See Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). Araujo's testimony was presented in a calm and reflective manner in which he gave every indication of honestly trying to remember the dates of past events.

<u>The Government provided ample evidence to corroborate Aurajo's testimony</u>

The wiretaps, deposit slips, and Dominguez-Gabriel's own post-arrest statements all corroborate Araujo's testimony. The Government introduced during trial recorded calls between Araujo and Dominguez-Gabriel in which the two discussed 1) making secret compartments in vehicles to conceal cocaine during transport (GX102T-1 at 6);  2) combining funds to purchase a kilogram of cocaine (GX102T-5 at 3 ("If you make ten thousand smackers and I put in seven five hundred we could buy one and you can sell that one and we can split the profits.")); 3) arranging a pickup of $35,000 cash (GX102T-6 at 4-5); 4) making deposits of the cash into various accounts (GX102T-8 at 2 (HECTOR:…Do you want me to send you the accounts where you're going to deposit?)); 5) planning a pickup of $1 million of Guido's proceeds (GX102T-8 at 3); 6) actually picking up $1.5 million cash (GX102T-9 at 4 (HECTOR: …How much did they give you? ALEX: One and a half.)); and 7) describing the exact bank accounts which the cash should be deposited into (GX102T-11 (HECTOR:…Washington Mutual…the account is thirty-

one…two, zero, zero…twelve…two, six zero. ALEX:…And that one doesn't require putting where it was opened or anything? HECTOR: Uh, yea. Here goes, Miami, Florida)). Further, the Government introduced recorded calls between Agent Tanella and Dominguez-Gabriel after Araujo had been seized with $1.5 million, in which Dominguez-Gabriel asked the agent "[h]ow did you get that money?...who is the snitches?" and offered the agent "up ten percent" of the seized money. (GX102T-12 at 4, 9.) Each of these recorded conversations corroborates various portions of Araujo's in-court testimony.[5] Further, the numerous deposit slips seized from Araujo, (GX225), and bank records from the banks showing the movement of the deposited cash totaling over $900,000, as illustrated in Government exhibits GX324A, GX324B, GX325A, GX325B, GX326, and GX327, demonstrated how cash he deposited in various accounts in the United States ultimately ended up in the account of Dominguez-Gabriel's business, TSM, in Mexico.

<u>The testimony of a single accomplice is sufficient to sustain a conviction, without corroboration</u>

While the above analysis indicates that significant portions of Araujo's testimony were corroborated through the recorded calls or other records, the Second Circuit makes clear that even if this were not the case – if Araujo's testimony as an accomplice went uncorroborated with other evidence – this would still be sufficient to sustain a conviction so long as his testimony was not incredible on its face and was capable of establishing guilt beyond a reasonable doubt. <u>See</u> <u>United States v. Hamilton</u>, 334 F.3d 170, 179 (2d Cir. 2003). The jury was able to observe Araujo's demeanor and attempts to recall dates on the stand and could have rationally concluded that his testimony was credible. In some cases, he corrected the dates himself, without being challenged on their accuracy. There was nothing to indicate that his testimony was incredible on

---

[5] <u>See</u> <u>supra</u> pp. 2-7.

its face and as such, the Court defers to the jury's resolution on Araujo's credibility. See United States v. Sanchez, 969 F.2d. 1409, 1414 (2d Cir. 1992).

Inconsistencies in testimonies had to do with dates and not events

Finally, Defendant claims that because Araujo's testimony was "riddled with inconsistencies, internal contradiction and incompleteness" the jury could not have reasonably found his testimony credible and thus unreasonably found Dominguez-Gabriel guilty of the counts charged. (Gov. Opp. at 23.) Specifically the Defendant calls attention to the inconsistencies in Araujo's testimony regarding: 1) dates associated with Dominguez-Gabriel's meeting with Araujo's associate, Eddie, at JFK Airport (Gov. Opp. Memo at 16-17, Tr. at 468-69,846-48, 850, 854); 2) dates associated with the Carnival Cruise Line drug trafficking to Florida (Gov. Opp. Memo at 20, Tr. at 811, 828); and 3) dates associated with the arrest of Angel Sanchez (Gov. Opp. Memo at 21, Tr. at 503-04). While it is true that Araujo provided inconsistent testimony with respect to certain dates, a reasonable jury – having observed his entire testimony including demeanor and body language – could have still found portions, or the entirety, of his testimony credible. Araujo gave detailed testimony regarding his meetings, conversations and interactions with Dominguez-Gabriel that a reasonable jury could have found credible. His inability to recall exact dates long prior to his arrest and with no records to refresh his recollection was not unusual given the circumstances. Araujo testified to over ten years worth of information concerning his relationship with Dominguez-Gabriel. During this ten-year period Araujo traveled throughout the United States to transport and sell cocaine, fled the United States to evade prosecution over a criminal action in Oklahoma, and re-entered the United States illegally several times. Given those facts, it is entirely reasonable that Araujo would not be able to give exact dates tracing each and every illegal act he committed during a ten-year period.

22

Thus, a reasonable jury could still credit Araujo's testimony regarding the events that occurred even though his testimony on the dates associated with the events was inconsistent.

In this regard, Defendant's argument that Araujo's and Marin's testimony regarding accomplices such as El Ingeniero, El Viejo, Pablo, and El Mamut, among others, should be discredited because the witnesses were unable to recall last names has little merit. It is entirely reasonable that individuals engaged in illicit activities would take on "code names" to maintain their anonymity from law enforcement and others. As such, a reasonable jury could still credit Araujo's and Marin's testimony regarding the names of coconspirators, even without testimony on the full government name of each individual. Indeed the Defendant, in the recorded calls, identifies El Ingeniero and Pablo as drug suppliers. Further, recorded conversations between Araujo and Dominguez-Gabriel and Marin and Dominguez-Gabriel indicate that speakers refer to their coconspirators by first name, or code name, only. (See e.g., GX102T-3, GX102T-6, GX104T-1, GX104T-2.)

> **c.** **The Government was not obligated to provide the missing tape recording to the Defense and the Government's failure to call its confidential source was not prejudicial to the Defendant**

The Defendant's final argument is that it was prejudiced 1) by the Governments failure to produce an undercover "key recording" from a meeting in Bogota, Colombia that allegedly took place with Dominguez-Gabriel after the Government's seizure and arrest of Araujo that "would have served the clarify the nature of [confidential informant Miguel] Duarte's role in the Government's investigation and prosecution" (Def. Memo at 28-29) and 2) by the Government's failure to call Duarte as a witness at trial.  First, with regards to the "key recording," the Government made clear to the defense, before and during trial, that it had attempted to locate this recording, but learned that, due to an equipment malfunction, none was made, and also

summarized what occurred at the meeting, as best as the agents could remember. (See Tr. at 34-35, 257-58, 1198-1200.) Further, Dominguez-Gabriel was informed that the recording was missing more than a month prior to trial. (Gov. Opp. Memo at 21.) The Government thus did everything it could – short of providing a non-existent tape – to provide the Defense with an understanding of what happened at that meeting.

Second, with respect to the Government's failure to call Duarte to the stand at trial, it must be noted that "[t]here is no legal requirement that the Government prove its case through any particular means." (Tr. at 2172, see United States v. Zapata, 1998 WL 681311, at *6 (2d Cir. 1998)). In its motion papers, the Defense argues that Duarte's extensive participation in the investigation supports it position that his absence from trial is a substantial basis for the Court to order a new trial (Def. Memo at 27.) The defense, however, using records voluntarily supplied by the Government, brought out on cross-examination of agents and Araujo, how Duarte had participated in the investigation (tr. at 238-39, 241-46, 251-55, 260-65, 657-75, 678-90,715-25, 764, 781-83, 794-95) and even played a video showing Duarte and Araujo on a New York City street together. (Id. at 829-38.) Accordingly, even though the Defense did not show that Duarte would have given material testimony, this Court, at the request of the Defense, and over Government objection,[6] included a missing witness charge in the jury instructions, which highlighted Duarte's role as a confidential informant and the fact that the Government was in the

---

[6] By letters dated December 12 and 13, 2010, the Government argued that the inclusion of a missing witness charge was inappropriate in this case because the witness was not in this country and: "[T]he defendant gave no notice to the Government that he wished to call Mr. Duarte…[and] had the Government been given any notice, it would have endeavored to make Mr. Duarte available…Second, the 'missing witness' instruction is made for situations where, based on the facts, the witness would have given material testimony and there is a reasonable and unfavorable inference that could be drawn from the witness' non-appearance…Third, a 'missing witness' instruction involving a confidential information…makes the Court's instruction on the use of confidential informants insufficient and confusing." (Letter from Benjamin Naftalis, Assistant United States Attorney to Honorable Robert P. Patterson, Jr. (December 13, 2010)).

best position to call him to testify.[7] (Tr. at 1196-98.) Consequently, Duarte's absence from the trial cannot be seen as prejudicial to the Defense.

## V.  Conclusion

In view of the foregoing, there was more than sufficient evidence for a reasonable jury to have found the Defendant guilty of all three counts of the indictment. Defendant's Fed. R. Crim. P. 29(c) and 33 motions are denied.


IT IS SO ORDERED.

_____

Robert P. Patterson, Jr.

U.S.D.J.

Dated:  New York, New York

April 22, 2011

---

[7] The Court instructed the jurors as follows: "You have heard testimony about a witness, Miguel Duarte, who has not been called to testify. As you are aware, Mr. Duarte is a confidential informant used by the Government. The defense has argued that the witness could have given material testimony in this case and that the Government was in the best position to produce this witness. If you find that Mr. Duarte could have been called by the Government and you find that he would have given important new testimony, relevant to the Defendant's guilt or innocence, you are permitted, but are not required, to infer that the testimony would not have been favorable to the Government. In deciding whether to draw an inference that Mr. Duarte would have testified unfavorably to the Government, you may consider whether the witness' testimony would have merely repeated other testimony and evidence already before you. The Government has no obligation to produce cumulative evidence." (Tr. at 1370.) The Defense did not object to this instruction. (Tr. at 1212, 1216.)

*Copies of this order were faxed to:*

**Robert Joel Krakow**
Office of Robert J. Krakow
1205 Franklin Avenue
Suite 110
Garden City , NY 11530
(516) 354-3300
Fax: (646)-349-1771

**Michael Max Rosensaft**
Assistant United States Attorney SDNY
Department of Justice
One Saint Andrew's Plaza
New York , NY 10007
(212)-637-2366
Fax: (212)-637-2527

**Benjamin Naftalis**
Assistant United States Attorney SDNY
Department of Justice
One Saint Andrew's Plaza
New York , NY 10007
(212) 637-2456
Fax: (212) 637-2527